

> Signed/Docketed
> November 21, 2011

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

| | |
|---|---|
| In re: ) | |
| ) | Case No. 05-51996 MER |
| PATRICIA J. KLOBERDANZ ) | |
| ) | Chapter 7 |
| Debtor. ) | |

### ORDER

THIS MATTER comes before the Court on the *Trustee's Motion to Revoke Technical Abandonment Under 11 U.S.C. Section 554(c)* (the "Revocation Motion"), and the Debtor's response thereto, and on the *Trustee's Application for Authority (A) to Employ and Compensate Freeman Auctions and Appraisals as Auctioneer and (B) to Sell Property of the Estate Free and Clear of Liens, Claims and Interests Pursuant to 11 U.S.C. Section 363(b)(1) by Public Auction* (the "Application"), and Debtor's response thereto.

### JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A)and (O), because it relates to the administration and the liquidation of assets of the estate.[1]

### BACKGROUND FACTS

On October 16, 2005, the Debtor, through her previous counsel, James Leerson, filed her voluntary petition under Chapter 7 (the "Petition Date").[2] Along with her Petition, the Debtor also filed her Statement of Financial Affairs with Schedules of Assets and Liabilities. In Schedule A, she disclosed real property located at 4555 Graystone Court, Springfield, Missouri (the "Missouri Property"), held in "fee simple" by the Debtor with a then-current market value of $40,000, and encumbered by secured claims totaling $39,727.18.[3] The Missouri Property was the only real property listed on Debtor's Schedules. The Debtor also disclosed certain personal

---

[1] Unless otherwise noted in the text, statutory references are to Title 11 of the United States Code.

[2] As previously noted by the Court in its May 17, 2011 Order, the parties acknowledge this case was filed during the rush of filings made just one day before the general effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").

[3] In Schedule D, the Debtor listed the following seven claims as being secured by the Missouri Property: 1) US Bank Home Mortgage - $4,727.18, 2) Rita Heimbegner - $7,000, 3) Merritt W. Fineout - $10,000, 4) Louise E. Kloberdanz - $6,000, 5) Tom Carter - $6,000, 6) Louise E. Kloberdanz - $4,000, and 7) Sharon Owens - $2,000.

property valued at $2,100 on Schedule B, to which she claimed exemptions under applicable Colorado Law.[4] The Debtor did not claim a homestead exemption in the Missouri Property, nor did she identify or claim exemptions in any personal property located at the Missouri Property.

On October 16, 2005, Charles Schlosser was appointed as Chapter 7 trustee. The Debtor received her discharge on February 15, 2006. Thereafter, on October 12, 2007, Mr. Schlosser filed a *No Asset Report*. The case was closed on November 15, 2007.

On June 4, 2008, the United States Trustee ("U.S. Trustee") filed a *Motion to Reopen Case* ("Motion to Reopen"). As grounds therefor he stated in part:

> Recently, the U.S. Trustee received an anonymous tip alleging that the Debtor concealed assets, rented storage units [in] which she concealed assets, and recorded several subordinate liens against her property at 4555 S. Graystone, Springfield, Missouri to secure nonexistent debts or debts owed for substantially lower amounts in order to create the illusion that there was no equity in that property.[5]

On that basis, the Court entered an order reopening the case on June 6, 2008.

When the case was reopened, Charles Schlosser resigned his position as trustee, citing a conflict of interest. Accordingly, on July 11, 2008, the U.S. Trustee appointed Daniel Hepner as successor trustee ("Trustee").

On December 9, 2008, the Trustee filed a *Notice of Possible Dividends*. The Trustee testified that in this Notice, he was referring to the Missouri Property and the personal property therein as the sources for any potential dividend to creditors.

On February 27, 2009, Mr. Leerson filed a *Motion to Withdraw as Attorney of Record*. As grounds for his withdrawal request, Mr. Leerson stated "substantive differences between the Debtor and her counsel have arisen that make further representation by counsel impossible."

On September 22, 2010, the Court entered an *Order for Status Report*, having noted the lack of activity in the case. In response thereto, on October 22, 2010, the Trustee filed a *Status Report* in which he advised the Court:

> The Trustee gave the Debtor the opportunity to attempt to obtain financing from third parties to purchase the estate's interest in the real and personal property. The Debtor was unable to secure financing. The Trustee has determined that it is appropriate to auction both the real and personal property located in Missouri. The Trustee has located an auctioneer in Missouri to liquidate the real and personal property and has

---

[4] COLO. REV. STAT. § 13-54-102.

[5] Motion to Reopen ¶ 3.

been working with the auctioneer on the terms of employment and sale. Trustee anticipates filing a Motion to Employ the Auctioneer and Sell the Real and Personal Property at Public Auction within ten (10) days of the date of this Status Report. The Trustee estimates that the real and personal property will be liquidated by the end of December, 2010.[6] [7]

A week later, on October 29, 2010, the Trustee filed the Application. Therein, the Trustee asserted he determined the second through seventh mortgages on the Missouri Property were never perfected and the first mortgage (to US Bank) had, prior to the reopening of the case, been paid and the lien released.

The Trustee approached Steve Freeman ("Freeman") of Freeman Auctions and requested he visit the Missouri Property and review its contents. After speaking with Freeman after the visit and reviewing photographs of the Missouri Property,[8] the Trustee determined the sale of the Missouri Property was in the best interests of the creditors of the Estate.[9]

In late October or early November, after the Application was filed, the Trustee instructed Freeman to prepare the Missouri Property for sale. Freeman had the locks changed, turned on the water, checked the electrical system, and had a dye test done to determine the state of the plumbing and whether the house was connected to the city sewer system. He put all financial documents, family photographs, old letters, graduation certificates, and other clearly personal items into boxes, per the Trustee's instructions. Freeman also threw out anything he determined was "trash" or "unsaleable," including a couch that smelled of urine, stained bedclothes, curtains that were deteriorated and moldy, old magazines and newspapers, and anything that was

---

[6] Oct. 22, 2009 Status Report, ¶ 3.

[7] Testimony at the hearing on the Revocation Motion and Application provided conflicting testimony relative to discussions between the Trustee and the Debtor's then counsel, Daniel Alexander ("Alexander"). The Debtor claims Alexander, on her behalf, made a number of overtures to the Trustee regarding the purchase the Missouri Property. The Debtor asserts the Trustee never gave her a firm dollar figure for the purchase of the house and contents and thus, she was unable to give potential lenders a firm proposal for a loan. By contrast, the Trustee testified he had multiple conversations with the Debtor about purchasing the Missouri Property and associated personal property, but the Debtor never made a firm offer.

[8] In July 2010, the Trustee contacted Freeman about the potential sale of the Missouri Property. As part of this process, the Trustee asked Freeman to visit and photograph the Missouri Property so the potential value of the real and personal property could be evaluated.

[9] Based on his observations, and taking into account such factors as the tax valuation of the property, sales prices for comparable properties, the condition of the plumbing and electrical systems, and other factors, Freeman concluded the Missouri Property would likely sell for between $30,000 and $35,000. He also believed the personal property would sell for $4,000 to $5,000.

"nasty."[10]  Freeman retained anything that might bring value to the estate if sold as part of a bundle, such as half-used rolls of scotch tape.  He said, "If it will bring in a dollar, I keep it."[11]

On November 19, 2010, the Debtor, acting *pro se*, filed an Objection to the Application (the "Application Objection").  Therein, she argued the Missouri Property was irrevocably abandoned when the case was closed, pursuant to § 554.  She asserted policy arguments relative to damage to a debtor's "fresh start" and the finality of judicial proceedings if the Court were to allow the Trustee to reopen the case, revoke abandonment, and administer a property interest simply because of an anonymous tip.  The Debtor further contended the personal property contained within the Missouri Property was exempt, and complained the Trustee refused to give her access to her property and told her he intended to sell it.[12]

Despite many conversations with Alexander about the potential auction, the Trustee indicated the first time anyone raised any questions about technical abandonment was when the Debtor filed her Application Objection.  Accordingly, on January 12, 2011, he filed the Revocation Motion, acknowledging the Motion to Reopen and resulting Order granting that motion did not explicitly address Mr. Schlosser's technical abandonment of unadministered assets caused by the case closure.  Nonetheless, the Trustee asserts a bankruptcy court has authority, in certain circumstances, to revoke a technical abandonment.  According to the Trustee, the circumstances of this case warranted the revocation of the technical abandonment of the Missouri Property.

On January 26, 2011, the Debtor filed her *Cross-Motion to Deny and Dismiss With Prejudice Trustee's Motion to Revoke Technical Abandonment*, which was "corrected" approximately one week later.  In this "corrected motion," the Debtor simply restated the arguments raised in the Application Objection.  She further argued the Trustee, by advertising the sale of the Missouri Property and by going through its contents before her deadline to object to the Application to Employ had expired, violated her constitutional rights for his own profit.

On February 22, 2011, the Court held a preliminary hearing on the matter and set an evidentiary hearing for May 4, 2011.  The Trustee filed witness and exhibit lists, along with a

---

[10]  Freeman explained an example of "nasty" might include a half-full box of macaroni with mouse droppings inside.  Freeman described the general condition of the house as "bad," noting because the house had been sealed, it was uninhabitable, smelly, and moldy.  Indeed, Freeman stated the house smelled so bad he had to put Vick's Vaporub in his nostrils so he could work.

[11]  It is important to note the testimony from Freeman that to the extent any property appeared to have possible sentimental value or to contain personal information, it was and has was and has been preserved.

[12]  The Debtor further argued Mr. Schlosser had ample opportunity, prior to her discharge, to analyze the value of the personal property and in fact, his certification indicated he had done so.  Debtor asserted the value of the Missouri Property was so low that its sale would not benefit the estate.  Further, the Debtor asserted neither of the attorneys she previously engaged had properly represented her interests during the bankruptcy case.  Finally, the Debtor complained her Fourth, Fifth, and Eleventh Amendment rights were violated by virtue of the Trustee's actions in this case.  Application Objection ¶ 20.

*Statement Regarding Stipulated Facts*, on April 20, 2011.[13]  On April 25, 2011, the Debtor, now represented by attorney L.B. Schwartz, filed a *Motion to Convert Case to Chapter 13* ("Motion to Convert"), along with a *Motion to Vacate* the evidentiary hearing.  A virtual order converting the case automatically entered.  The Trustee filed an objection to the Motion to Convert the next day.

On May 4, 2011, the Court held a hearing on the Motion to Convert.  Two days later (on May 6, 2011), and before a ruling on the Motion to Convert, the Debtor filed her amended Schedules A, B, D, F, I, and J.  In her amended Schedule A, the Debtor listed the Missouri Property with a value of $15,000.00, subject to a secured claim in the amount of $4,727.18.  On Schedule B, the Debtor listed "Various items of furniture and household goods" at the Missouri Property, with a value of $3,000.00.  The Debtor did not file an amended Schedule C, and thus did not assert exemptions in any of the property identified.

On May 15, 2011, the Court entered an Order treating the objection to the Motion to Convert as a motion to reconsider, granting the relief sought therein and reconverting the case from Chapter 13 to Chapter 7.  Approximately two months later, Mr. Schwartz moved for permission to withdraw as the Debtor's counsel.

On July 19, 2011, the Court held a preliminary hearing on the Revocation Motion, setting the matter for an evidentiary hearing to be held on September 9, 2011.  At that time, the Court notified the parties the matter would go forward, and no continuances would be granted.  On August 25, 2011, the Debtor filed a motion to extend the time to submit witness and exhibit lists to August 29, 2011, which was granted.

On August 26, 2011, the Debtor filed her *Motion for Summary Judgment* (the "Summary Judgment Motion").  She thereafter filed an affidavit in which she requested the Court stay the requirement to submit witness and exhibit lists pending its determination of her Summary Judgment Motion.[14]  On August 30, 2011, the Trustee filed a *Motion to Strike the Motion for Summary Judgment* and an objection to the request for stay.

On September 6, 2011, the Court issued an Order denying the Summary Judgment Motion and the request to stay the requirement to submit witness and exhibit lists.  The Court's Order stated, however, the exhibits attached to the Summary Judgment Motion could be offered at the September 9, 2011 hearing.

---

[13]  The Debtor did not file witness and exhibit lists.  Further, the Trustee noted in the Statement Regarding Stipulated facts that his efforts to contact the Debtor to discuss potential stipulations failed.

[14]  On the same day, the Trustee timely filed his list of witnesses and exhibits for the September 9, 2011 hearing.

On September 8, 2011, the Debtor filed her *Motion for Reconsideration* in which she argued her due process rights were violated by the Court's determination of her Summary Judgment Motion before receiving the Trustee's response to the same and without providing her a chance to reply to any such response. On the same day, the Court denied the *Motion for Reconsideration*.

At the outset of the September 9, 2011 hearing, the Debtor again raised an objection to the Court's determination of the Summary Judgment Motion and its Order denying her *Motion for Reconsideration*, again contending her due process rights were violated by the process employed by the Court.

## DISCUSSION

**A.     Due Process**

The Court addressed Debtor's due process concerns at the September 9, 2011 hearing. However, additional discussion is merited for clarity of the record.

The due process clause of the Fifth Amendment provides that no one may "be deprived of life, liberty, or property, without due process of law."[15] Due process, at a minimum, "require[s] that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case."[16] "The fundamental requisite of due process of law is the opportunity to be heard."[17] Essentially, due process requires the procedures be fair.[18]

Here, the Revocation Motion was pending since January 12, 2011. The Court held a preliminary hearing on the Revocation Motion in July 2011, at which time the Court determined it required evidence in order to resolve the matter. As a result, the Court scheduled an evidentiary hearing, advising the parties no continuances would be granted. The Debtor thus had eight months in which to file her Summary Judgment Motion. The Debtor's last-minute filing of her pleading does not require the Court to halt proceedings – especially since the Debtor had ample notice of the scheduled hearing and more than sufficient opportunity to prepare for it. Further, even though the Debtor delayed in filing the Summary Judgment Motion, the Court postponed its work on other pending matters to evaluate the Debtor's arguments before the

---

[15] U.S. CONST. amend. V.

[16] *Goss v. Lopez*, 419 U.S. 565, 578-79 (1975) (quoting *Mullane Central Hanover Trust Co.*, 339 U.S. 306, 313 (1950).

[17] *Id.* at 579 (quoting *Grannis v. Ordean*, 234 U.S. 385, 394 (1914)).

[18] *In re Murchison*, 349 U.S. 133, 136 (1955).

September 9, 2011 hearing. The Debtor was not denied any opportunity to present her arguments,[19] and the mere fact the Court ruled on the matter promptly does not mean the Debtor's arguments received any less consideration than was merited. Indeed, though the Court denied the Summary Judgment Motion, the Debtor was afforded the opportunity at the September 9, 2011 hearing to reiterate her old arguments, make new ones, and present evidence to the Court. There was nothing unfair or prejudicial about the procedure employed, and the Court is confident due process was satisfied.

### B.   Abandonment of Assets

A debtor is responsible for disclosing all assets to the bankruptcy court.[20] "Under 11 U.S.C. § 554(c), property that is scheduled but not otherwise administered at the time of the closing of a case is abandoned to the debtor; however, property of the estate that is not scheduled in the case, and therefore not abandoned, remains property of the estate."[21]

#### *1.   Personal Property*

There is no dispute the Debtor failed to identify the contents of the Missouri Property in her original Schedule B. That property, therefore, was not technically abandoned when the Debtor's case was closed on November 15, 2007, and remains part of the revived bankruptcy estate.[22]

#### *2.   Missouri Property*

When the Debtor's case was closed on November 15, 2007, the Missouri Property was technically abandoned to the Debtor by operation of law.[23] The Debtor contends the

---

[19] The Debtor argues the Trustee should have been given time to respond, and the Debtor should have been given time to file a reply. However, under this Court's local rules, replies may be filed only upon leave of the Court. L.B.R. 7056-1(e). Thus, the Court's prompt adjudication of the matter did not deny the Debtor any procedural right she was afforded under the Rules.

[20] 11 U.S.C. § 521(a)(1)(B). This section, formerly § 521(1), was renumbered as § 521(a)(1) by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, § 106(c)(1), Pub.L. No. 109-8, 119 Stat. 23 (2005). The former section was in effect at the time of Debtor's filing. The obligation to disclose assets was the same under the former section as under the current one.

[21] *Graupner v. Town of Brookfield*, 450 F. Supp. 2d 119, 125 (D. Mass. 2006). *See also Jeffrey v. Desmond*, 70 F.3d 183, 186 n. 3 (1st Cir. 1995) ("[A]ny asset not properly scheduled remains property of the bankrupt estate, and the debtor loses all rights to enforce it in his own name.")

[22] Debtor has not claimed an exemption in any personal property located at the Missouri Property.

[23] 11 U.S.C. § 554(c). *See also In re Woods*, 173 F.3d 770, 776 (10th Cir. 1999) ("Under § 554(c), a technical abandonment is necessarily the effect of the closing order, regardless of the trustee's intentions.").

abandonment is irrevocable, citing *In re Reiman*, 431 B.R. 901 (Bankr. E.D. Mich. 2010), *Morlan v. Universal Guaranty Life Ins. Co.*, 298 F.3d 609, 618 (7th Cir. 2002), and other opinions in support of her argument. While those cases describe the general rule that abandonment is irrevocable, they, and the Tenth Circuit precedent governing this Court, also hold abandonment *is* revocable under certain circumstances.[24]

The Tenth Circuit has stated a bankruptcy court can exercise its discretion, and its equitable powers, to reopen a case and administer further relief pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. Rule 60(b) provides, in relevant part,

> On motion and just terms, the court may relieve a part or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; . . . (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or other misconduct by an opposing party; . . . or (6) any other reason that justifies relief.[25]

In this case, the Debtor's Schedules misrepresented both the amount and number of secured claims on the Missouri Property. Thus, on its face, one of the enumerated circumstances in Rule 60(b) justifying reopening a closed bankruptcy case and revoking an order of abandonment exists.[26]

The Debtor argues showing misrepresentation is not sufficient to employ Rule 60, and the Trustee needs to show she intentionally made the misrepresentations on her schedules. The Debtor is incorrect. By its very terms, Rule 60(b)(3) does not require a showing of intent – instead, it merely requires "misrepresentation . . . by an opposing party." Indeed, to require a showing of intent would undercut subsection (1), which allows relief from a final order for mere mistake, and subsection (3), which allows the Court to grant relief for "any other reason that justifies relief."[27]

---

[24] *See*, *e.g.*, *Woods*, 173 F.3d at 778 (holding that, in appropriate circumstances, court may revoke abandonment under Rule 60(b)); *Morlan*, 298 F.3d at 618 (noting that "abandonment is revocable only in very limited circumstances, such as 'where the trustee is given incomplete or false information of the asset by the debtor, thereby foregoing a proper investigation of the asset'") (quoting *Catalano v. Comm'r*, 279 F.3d 682, 686 (9th Cir. 2002); *Reiman* (noting courts have applied Rule 60(b) to determine whether revocation of a statutory abandonment under § 554(c) should be granted).

[25] FED. R. CIV. P. 60(b).

[26] *See Morlan*, 298 F.3d at 618 (noting that abandonment is revocable when trustee is given incomplete or false information about an asset).

[27] Even if the Court had to make a determination of intent, Debtor's objection would not be sustained, for the Court does not find credible Debtor's explanation that she did not understand she had to record the mortgages against her home in order for them to be considered secured liens.

Here, the Debtor's misrepresentations meant Mr. Schlosser was not alerted to the existence of assets available for liquidation and distribution to creditors. The Debtor's misrepresentation was material, prejudicial to the creditors and undermined the bankruptcy process. Accordingly, the Court concludes sufficient grounds existed for the reopening of this case and further, the Revocation Motion should be granted.[28]

## C.     Timing of Application and Rights in the Property

The Debtor objects to the Trustee's Application claiming it was filed prior to the Court's determination of his Revocation Motion. She contends the actions the Trustee took in hiring Freeman Auctions and Appraisals, along with Freeman's discarding of certain items of personal property located at the Missouri Property and his posting of a notice of sale prior to the Court's determination of the Revocation Motion, violated her Fourth, Fifth, and Eleventh Amendment rights.

The Debtor's arguments are without merit. First, The Debtor lacks standing to raise questions about whether such property was properly administered.[29] Second, the Trustee's actions in advance of this Court's adjudication of the Revocation Motion did not violate the Debtor's rights. The Trustee's testimony is credible that, prior to and during the process of engaging Freeman, he was in regular contact with the Debtor's attorney about sale of the Missouri Property and its contents, and heard no objections about moving forward with the proposed sale. His testimony is also credible that no one raised questions regarding abandonment until the Debtor filed her Application Objection. Until that Objection, there was no reason for the Trustee to doubt his right to begin administering the Missouri Property. Moreover, the Trustee noted it was customary for him to begin the process of administering the estate as soon as possible where it appeared there would be no objection to his doing so. Therefore, there was nothing premature about his actions.

Further, there is no evidence the Trustee has acted in other than a responsible, professional manner in his efforts to sell the Missouri Property and ancillary items located

---

[28] The Debtor argues granting the relief requested by the Trustee would undercut the policy favoring the finality of judicial proceedings. This Court views the matter differently. Granting such relief furthers the equally important policy of ensuring bankruptcy debtors comply with their obligation to provide accurate information on their schedules. As the Trustee notes, it is imperative he be able to rely on the accuracy of a debtor's schedules. Were that not the case, the system simply could not function.

[29] *See Jeffrey v. Desmond*, 70 F.3d 183, 186 n.3 (1st Cir.1995)("[A]ny asset not properly scheduled remains property of the bankrupt estate, and the debtor loses all rights to enforce it in his own name.")(citing *Vreugdenhill v. Navistar Int'l Trans. Corp.*, 950 F.2d 524, 526 (8th Cir. 1991)).

therein (the "Additional Missouri Assets").[30] The evidence suggests that, rather than harming the Missouri Property, the Trustee's actions, in fact, enhanced its value. Indeed, per the Trustee's instructions, Freeman cleared the Missouri Property of trash and performed long neglected basic maintenance. Further, even if the Trustee did act prematurely – and the Court finds that he did not – there was no harm to the Debtor as a result because the Missouri Property and the Additional Missouri Assets are not hers, but the estate's.[31]

Finally, there is no basis for the Debtor's constitutional arguments. The Debtor voluntarily submitted herself to the jurisdiction of this Court and to the bankruptcy process. In so doing, the Property and the Additional Missouri Assets became property of the bankruptcy estate pursuant to § 541.[32] Thus, any items that were seized were not hers. As such, the Trustee was within his rights to determine whether the Missouri Property and the Additional Missouri Assets, or any part thereof, were in such poor condition that they were of no value to anyone, including the Debtor. Further, even if the any of the items were hers, the Trustee was not an agent of the government, so no Fourth Amendment right is implicated.[33]

Debtor's Fifth Amendment argument is equally without merit. Because the items at issue belong to the bankruptcy estate, not to the Debtor personally, her due process rights are not implicated by the Trustee's actions.

Although the Debtor referred briefly to the Eleventh Amendment, it is unclear to the Court how that Amendment might apply. Debtor has not made any legal argument nor cited any authority which might explain her position. Accordingly, the Court will not consider this argument.

---

[30] The Court does not find credible the Debtor's suggestions the Trustee threatened to get federal marshals to evict her from the Missouri Property if she were to go there. To the contrary, the Court believes the Trustee's testimony that he has advised the Debtor, and any of her family members who have inquired, he would grant them access to the Missouri Property so they could pick up personal items, as long as they made arrangements to do so with a representative of the estate present.

[31] Again, the Debtor has not claimed any exemptions in the Missouri Property nor in the Additional Missouri Assets. Although the Debtor has intimated her attorneys failed her by not asserting any claims of exemption on her behalf and by failing to advise her properly about certain other issues in this case, such failures do not provide a current basis for objection. Indeed, the Debtor's only remedies, if indeed her attorneys failed her, are at state law.

[32] *See* §§ 541, 554(c).

[33] *See*, *e.g.*, *Wells v. U.S.*, 98 B.R. 806, 810 (N.D. Ill. 1989) ( "For one thing, a trustee in bankruptcy has long been held not to be an agent of the United States.") (citation omitted).

**TRUSTEE'S APPLICATION FOR AUTHORITY (A) TO EMPLOY AND COMPENSATE FREEMAN AUCTIONS AND APPRAISALS AS AUCTIONEER AND (B) TO SELL PROPERTY OF ESTATE FREE AND CLEAN OF LIENS, CLAIMS AND INTERESTS PURSUANT TO 11 U.S.C. SECTION 363(b)(1) BY PUBLIC AUCTION**

### A.   Application to Employ

"A bankruptcy court has the authority and the responsibility to only approve employment of professionals who meet the minimum requirements set forth in § 327(a), independent of objections. . . .  An applicant under § 327(a) has the burden of establishing by application and accompanying affidavit that its chosen professional is qualified."[34]  Section 327 states in relevant part:

> (a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.[35]

Subsection (a) thus sets forth two requirements: an auctioneer or real estate agents must 1) "not hold or represent an interest adverse to the estate" and 2) be a "disinterested person."[36] "Together, the statutory requirements of disinterestedness and no interest adverse to the estate 'serve the important policy of ensuring that all professionals appointed pursuant to section 327(a)  tender undivided loyalty and provide untainted advice and assistance in furtherance of their fiduciary responsibilities.'"[37]

The testimony at the September 9, 2011 hearing demonstrates Freeman has substantial experience in selling and auctioning both real and personal property, and he also has substantial experience and familiarity with the relevant real estate market.  The testimony, and Freeman's affidavit,[38] establish Freeman does not hold or represent an interest adverse to the estate and is disinterested.  Further, the Trustee's proposed plan for payment of Freeman ensures Freeman's

---

[34]  *In re Interwest Bus. Equip., Inc*., 23 F.3d 311, 317–318 (10th Cir. 1994) (internal citation omitted).

[35]  11 U.S.C. § 327 (emphasis added).  *See also In re Martin,* 817 F.2d 175, 177, n.1 (1st Cir. 1987) ("Although § 327(a), by its terms, speaks of representing 'the trustee,' § 1107(a) (1978) makes § 327(a) applicable to attorneys appointed to assist chapter 11 debtors in possession.").

[36]  *In re Cook,* 223 B.R. 782, 789 (10th Cir. BAP 1998).

[37]  *In re Crivello,* 134 F.3d 831, 836 (7th Cir. 1998) (quoting *Rome v. Braunstein,* 19 F.3d 54, 58 (1st Cir. 1994)).

[38]  Application, Ex. A.

interests and those of the estate will coincide.[39] By proposing to pay Freeman a percentage of the revenues gained through sale of the Missouri Property and the Additional Missouri Assets, the proposed payment structure provides an incentive for Freeman to maximize those revenues for the benefit of both himself and the estate.[16] Accordingly, the Court finds Freeman's employment should be approved.

### B. Application to Sell Free and Clear of Liens

The Trustee also seeks authority to sell the Missouri Property and the Additional Missouri Assets at auction free and clear of liens pursuant to § 363(b) and (f). Further, the Trustee seeks authority to pay the following from the proceeds of the sale of the Missouri Property and the Additional Missouri Assets:

> (1) the amounts owing to the Greene County Collector for unpaid real property taxes; (2) a 7% commission on the gross proceeds of the sale of the Property to the auctioneer; (3) all costs charged by Hogan Land Title in connection with the closing of the sale of the Property; (4) a 12% commission on the gross proceeds of the sale of the Chattel to the auctioneer; and (5) all necessary costs and expenses incurred by auctioneer in connection with the sale of the Property and the Chattel not to exceed $3,250.00.[17]

The Debtor made no objection to this aspect of the Application and the Court concludes this request should be granted.

### CONCLUSION

For the reasons stated above, it is

ORDERED that the Trustee's *Motion to Revoke Abandonment* is GRANTED. It is

FURTHER ORDERED that the *Application for Authority (A) to Employ and Compensate Freeman Auctions and Appraisals as Auctioneer and (B) to Sell Property of the Estate Free and Clear of Liens, Claims and Interests Pursuant to 11 U.S.C. Section 363(b)(1) by Public Auction* is GRANTED.

---

[39] In the Application, the Trustee seeks to compensate Freeman by paying him a 7% commission on sale of the Missouri Property, and a 12% commission on sale of the personal property. (Application ¶ 14, 15.)

[16] Indeed, the Debtor stated she did not oppose Freeman's employment, but rather objected to the Trustee's actions in the case as discussed above.

[17] Application ¶ 23.

In accordance therewith, it is

ORDERED the Trustee is authorized to employ Steve Freeman and Freeman Auctions & Appraisal to 1) inventory the personal property located at 4555 Graystone Court, Springfield, Missouri, and 2) pursuant to 11 U.S.C. § 363(b) and (f), sell the real property and improvements located at 4555 Graystone Court in Springfield, Missouri, as well as the estate property located therein, by public auction pursuant to the procedures set forth in the Application. It is

FURTHER ORDERED that the Trustee is authorized to pay the following from the proceeds of the sale of the auctioned items: 1) the amounts owing to the Greene County Collector for unpaid real property taxes; 2) a 7% commission on the gross proceeds of the sale of the Property to the auctioneer; 3) all costs charged by Hogan Land Title in connection with the closing of the sale of the Property; 4) a 12% commission on the gross proceeds of the sale of the Chattel to the auctioneer; and 5) all necessary costs and expenses incurred by auctioneer in connection with the sale of the auctioned items not to exceed $3,250.00.

Dated November 21, 2011

BY THE COURT:

Michael E. Romero
U.S. Bankruptcy Judge